UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| KRYSTA M. SMITH,<br>       Plaintiff, | )<br>)<br>) |
| v. | )   CAUSE NO.: 1:20-CV-55-HAB-JPK |
| | ) |
| ANDREW M. SAUL,<br>Commissioner of Social Security<br>Administration,<br>       Defendant. | )<br>)<br>)<br>)<br>) |

**FINDINGS, REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE PURSUANT TO
28 U.S.C. § 636(b)(1)(B) & (C)**

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Krysta M. Smith on February 1, 2020, and Plaintiff's Opening Brief [DE 18]. Defendant filed a response, and Plaintiff filed a reply.

On April 14, 2020, District Court Judge Holly A. Brady entered an Order [DE 10] referring this matter to the undersigned Magistrate Judge for a report and recommendation on the instant briefing pursuant to 28 U.S.C. § 636(b)(1)(B). This Report constitutes the undersigned Magistrate Judge's combined proposed findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). For the following reasons, the Court recommends that the District Court reverse the decision of the Social Security Administration and remand for further proceedings.

**PROCEDURAL BACKGROUND**

On April 13, 2017, Plaintiff protectively filed an application for supplemental security income, alleging disability beginning June 20, 2005. The application was denied initially and on reconsideration. Plaintiff then requested a hearing, which was held before an Administrative Law

Judge (ALJ) on November 29, 2018. On February 1, 2019, the ALJ issued an unfavorable decision, making the following findings:[1]

> 1. The claimant has not engaged in substantial gainful activity since April 13, 2017, the application date.
>
> 2. The claimant has the following severe impairments: chronic knee pain problems (Exhibit 3F); bilateral thumb tendinitis/trigger thumbs, status post surgical interventions for both the right and the left thumbs in 2018 (Exhibit 3F, 4F, 6F, 8F); history of diabetes without major complications, hypothyroidism and morbid obesity (Exhibit 1F, 3F, 4F, 6F); history of bronchitis/asthma/obstructive ventilatory defect with a history of smoking (Exhibit 4F); cysts in the ovaries (Exhibit 4F); history of anxiety/panic disorder and depression (Exhibit 1F, 2F, 3F, 4F, 6F, 7F).
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
>
> 4. After careful consideration of the entire record, the [ALJ found] that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; never climbing ladders, ropes, or scaffolds; only frequent bilateral handling and fingering; needs to avoid concentrated exposure to extreme cold, heat, loud noise, pulmonary irritants including fumes, odors, dust, gases, poorly ventilated areas and chemicals, and hazards including operational control of dangerous moving machinery, unprotected heights, slippery/uneven/moving surfaces. She also must work in an indoor temperature controlled environment. Mentally, the claimant is limited to understanding, carrying out and remembering simple instructions consistent with unskilled work, defined as occupations that can be fully learned within a short period of time of no more than 30 days and requires little or no judgment to perform simple tasks with the ability to sustain those tasks throughout an eight-hour workday without frequent redirection to task; work that does not require satisfaction of strict or rigid production quotas or does not involve assembly-line pace work; only occasional interactions with others including supervisors, coworkers, and the general public; and no work with large groups of people (meaning no more than 10 people).

---

[1] These findings quote the bolded findings throughout the ALJ's decision. Internal citations to the Code of Federal Regulations are omitted.

2

5. The claimant has no past relevant work.

6. The claimant was born [in] 1987 and was 29 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7. The claimant has at least a high school education and is able to communicate in English.

8. Transferability of job skills is not an issue because the claimant does not have past relevant work.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Social Security Act, since April 13, 2017, the date the application was filed.

(AR 17-29[2]).

The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481. Plaintiff then filed this civil action seeking review of the Agency's decision pursuant to 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the agency's final decision. 42 U.S.C. § 405(g). The question before the Court is not whether the claimant is in fact disabled, but whether the ALJ's decision "applies the correct legal standard and is supported by substantial evidence." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017); 42 U.S.C. § 405(g). Under § 405(g), the Court must accept the Commissioner's factual findings as conclusive if they are supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as

---

[2] Page numbers in the Administrative Record (AR) refer to the page numbers assigned by the filer, which are found on the lower right corner of the page, and not the page numbers assigned by the Court's CM/ECF system.

3

adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120-21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts in evidence, or substitute its judgment for that of the ALJ. *See McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). However, "if the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)). At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ also has a basic obligation to develop a full and fair record and "must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability," which is defined as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). The ALJ follows a five-step inquiry to determine whether a claimant is disabled: (1) whether the claimant has engaged in substantial gainful activity since the alleged onset of disability, (2) whether the claimant has a medically determinable impairment or combination of impairments that is severe, (3) whether the claimant's impairment

4

or combination of impairments meets or medically equals the criteria of any presumptively disabling impairment listed in the regulations, (4) if the claimant does not meet a listing, whether she is unable to perform her past relevant work, and (5) if the claimant is unable to perform past relevant work, whether she is unable to perform any work in the national economy. *See* 20 C.F.R. § 416.920(a)(4)(i)-(v).

Prior to step four, the ALJ determines the claimant's residual functional capacity (RFC), which "is an administrative assessment of what work-related activities an individual can perform despite her limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). An affirmative answer at either step three or step five leads to a finding of disability. *Briscoe ex rel. Taylor v. Barnhart*, 524 F.3d 345, 352 (7th Cir. 2005); 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

## ANALYSIS

Plaintiff asserts two grounds for reversal of the ALJ's decision. She contends that (1) the ALJ erred in arriving at the RFC determination, and 2) the ALJ's step five determination is not supported by substantial evidence. While the Court does not agree with all of Plaintiff's subsidiary arguments—and notes that the ALJ held a lengthy hearing addressing many of Plaintiff's concerns—the Court nonetheless recommends remand for the reasons discussed below.

### A. Residual Functional Capacity

Plaintiff argues that the ALJ erred by placing improper emphasis on Plaintiff's daily activities in arriving at the RFC determination. (Pl.'s Br. 11-22, ECF No. 18). The Commissioner, in turn, asserts that the ALJ properly considered the record and that the RFC determination is supported by substantial evidence. (Def.'s Mem. 4-14, ECF No. 21).

5

The RFC is a measure of what an individual can do despite the limitations imposed by her impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. § 404.1545(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. § 404.1527(e)(1); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). The RFC is an issue at steps four and five of the sequential evaluation process and must be supported by substantial evidence. SSR 96-8p, 1996 WL 374184, at *3 (July 2, 1996).; *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing' basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, at *1. "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The relevant evidence includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *Id.* at *5. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id*. The "ALJ must also consider the combined effects of all the claimant's impairments, even those that would not be considered severe in isolation." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *see also Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003).

Plaintiff asserts that the ALJ's determination that Plaintiff could work an eight-hour workday was predicated on her ability to perform certain daily activities. (Pl.'s Br. 12, ECF No. 18

(citing AR 22)). As noted above, the RFC contains the following limitations to account for Plaintiff's mental impairments:

> Mentally, the claimant is limited to understanding, carrying out and remembering simple instructions consistent with unskilled work, defined as occupations that can be fully learned within a short period of time of no more than 30 days and requires little or no judgment to perform simple tasks with the ability to sustain those tasks throughout an eight-hour workday without frequent redirection to task; work that does not require satisfaction of strict or rigid production quotas or does not involve assembly-line pace work; only occasional interactions with others including supervisors, coworkers, and the general public; and no work with large groups of people (meaning no more than 10 people).

(AR 21). In arriving at this determination, the ALJ explained:

> [Plaintiff's] daily activities demonstrate a mental capacity to understand, remember, and apply information in the context of performing unskilled work defined as occupations that can be fully learned within a short period of time of no more than 30 days and requires little or no judgment to perform simple tasks with the ability to sustain those tasks throughout an eight-hour workday without frequent redirection to task.

(AR 22). The ALJ noted evidence in the record reflecting that Plaintiff "prepares simple meals, takes care of her two-year-old daughter, performs household chores including cleaning, laundry, and dishes, takes care of pets, drives, shops in stores, handles personal finances, reads, knits, and exercises." (AR 22). The ALJ concluded that "[t]hese tasks require sustained concentration/persistence/pace, ability to adapt/manage oneself, and a capacity to engage in appropriate social interaction with people outside of a social circle. The claimant reported 10 people as a crowd, so the undersigned restricted her to no work with more than 10 people." (AR 22).

The ALJ's reliance on Plaintiff's daily activities was not confined to a finding on Plaintiff's limitations due to any mental impairments. Later in the opinion, the ALJ determined that, while Plaintiff "may experience some symptoms and functional limitations associated with her severe

impairments, evidence regarding daily activities demonstrates a greater level of physical and psychological function than the claimant alleges." (AR 27). To support this determination, the ALJ explained:

> [Plaintiff] noted that she prepares simple meals, takes care of her daughter, performs household chores including cleaning, laundry and dishes, takes care of pets, drives, shops in stores, handles personal finances, reads, knits, and exercises. In addition to the aforementioned daily activities, the claimant testified that she bathes, feeds, and takes care of her two-year-old daughter by herself during the day, cooks on the stove, tries to help with some household chores such as sweeping and dishes with some difficulty holding on to dishes, reads books, manages her own money, goes to the grocery store and laundromat with her friend, and watches two teenagers 5 days per week in exchange for diapers, wipes, or other items for her daughter. Clinical notes also cite her reports of going to the library with her daughter, listening to music, taking care of her home and daughter, talking to her mother and friends, knitting, and doing about 60 minutes of activity a day. These activities illustrate the claimant's capacity to carry out high-level daily activities irrespective of her symptoms.

(AR 27 (internal citations omitted)).

The Seventh Circuit Court of Appeals has often warned against equating the performance of daily activities with the ability to perform full time, competitive work. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer."); *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *Zurawski*, 245 F.3d at 887. Here, the ALJ placed undue emphasis on Plaintiff's daily activities in arriving at the RFC determination.

The Court does not suggest, however, that it was wholly improper for the ALJ to consider Plaintiff's daily activities. Per the regulations and case law, ALJs are directed to consider a claimant's daily activities when evaluating a claimant's credibility and the severity of her symptoms. *See Shumaker v. Colvin*, 632 F. App'x 861, 866 (7th Cir. 2015) (noting the ALJ

8

permissibly evaluated the plaintiff's daily activities against her asserted impairments in assessing whether she was exaggerating the effects of her impairments); *see also* 20 C.F.R. § 404.1529(c)(3)(i) (explaining that the ALJ will consider daily activities in evaluating a claimant's symptoms); SSR 96-7p, 1996 WL 374186, at *3 (Jul. 2, 1996) (directing the ALJ to consider daily activities in determining the credibility of a claimant's statements about symptoms). Here, the relevant question is whether, in considering her daily activities, the ALJ improperly equated Plaintiff's performance of these activities with an ability to perform full time work.

In the instant case, the ALJ seemed to equate Plaintiff's ability to conduct certain daily activities with her ability to perform full time work, concluding that she can "carry out high-level daily activities" and that these activities "demonstrate a mental capacity to understand, remember, and apply information *in the context of performing unskilled work* . . . ." (AR 22, 27 (emphasis added)). And, while the Court must consider that conclusion in the context of the entirety of the ALJ's decision, which certainly provided additional analysis of Plaintiff's ability to work and cited Plaintiff's daily activities, at least in part, for the permissible purpose of showing whether such activities were consistent with Plaintiff's claimed symptoms, the ALJ's analysis impermissibly tied daily activities directly to Plaintiff's ability to work. This was error.

Whatever concentration, persistence, or pace, ability to adapt or manage oneself, or capacity to engage in appropriate social interaction with people outside of a social circle may be required to perform Plaintiff's daily activities, it is not an indication of what Plaintiff may be capable of performing in a work setting. And, perhaps more critically, the records upon which the ALJ relied evince difficulties performing the very daily activities that the ALJ stated underscore Plaintiff's ability to perform full time work. These records contain Plaintiff's self-reported daily

9

activities *and* reports that those very activities were performed in a manner, or resulted in pain, such that it would make them unsuitable for comparison to the ability to perform full time work.

A 2017 psychological consultative examination states that Plaintiff has had trouble with dressing and bathing due to anxiety, that she has had trouble cooking, cleaning, and doing laundry when her hand acts up,[3] and that she has had trouble shopping. (AR 343). Progress notes from a 2018 behavioral health assessment additionally state that Plaintiff needs "some support" in the area of parenting and supervision of her child, that she needs "assistance in the area of living skills and self care," and that she "struggles in the area of interpersonal skills." (AR 550-52). Records cited by the ALJ further reflect that Plaintiff needs help changing her daughter's diapers, as well as help with doing the dishes and other chores due to her knees.[4] (AR 239). These records suggest that Plaintiff needs help getting both herself and her daughter out of the bathtub, and that Plaintiff needs help with certain clothing items. (AR 239, 242). And, while the ALJ stated that Plaintiff exercises, the relevant record actually reflects that Plaintiff *cannot* exercise due to knee issues. (AR 245). As such, not only did the ALJ place inappropriate emphasis on Plaintiff's ability to perform certain daily activities, but the very records upon which the ALJ relied in arriving at the RFC determination do not support the ALJ's conclusion. Perhaps the ALJ could consider these records and again reach the same conclusion, as many of the records discussed above contain self-reported symptoms and the ALJ is instructed to determine whether the allegations concerning the intensity, persistence, and limiting effects of a claimant's symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R.

---

[3] The medical records reflect that Plaintiff has been seen and treated for aching pain in her right hand, as well as for pain in both her right and left thumbs. (AR 385-86, 391, 401, 506, 531, 619, 635, 639).

[4] The medical records reflect that Plaintiff has a history of knee pain on both sides. (AR 410, 419, 424, 434, 495, 515, 610).

§ 404.1529(a), (c)(4) (describing how the Social Security Administration considers symptoms). However, relying on only part of the record and ignoring contrary evidence is eerily similar to the "cherry picking" that the Seventh Circuit Court of Appeals has warned against. *Plessinger v. Berryhill*, 900 F.3d 909, 915 (7th Cir. 2018) (ALJ "misconstrued (or worse, cherry-picked)" statements from medical opinion relied upon: "ALJs are not permitted to cherry-pick evidence from the record to support their conclusions, without engaging with the evidence that weighs against their findings").

Plaintiff's hearing testimony provided yet more contradictions to the ALJ's finding. Plaintiff testified that, once every two weeks, she spends a day on the couch in the fetal position due to pain caused by ovarian cysts. (AR 83). She further testified that her depression causes her to experience an irritability or anger episode, for which she sequesters herself until she calms down, usually once per day. (AR 61). Plaintiff stated that she sometimes has trouble holding silverware for her daughter, that Plaintiff has trouble brushing her own hair because her arms and hands hurt when she's trying to hold the brush due to her trigger thumbs,[5] that she sometimes needs to use an electric cart while grocery shopping due to her knee condition, and that she has to take breaks while washing dishes because her hands will begin to hurt very badly. (AR 68-71). Plaintiff explained that she tries to knit once a day, but she can only do so for fifteen minutes at a time. (AR 74). She further explained that she can only write for approximately ten to fifteen minutes before she needs to stop, that she has difficulty texting due to the phone slipping from her hand because she cannot hold it properly, and that she has difficulty going to the laundromat due to hand and knee pain. (AR 77-79). Finally, Plaintiff testified that she has to take breaks while

[5] The medical records reflect that Plaintiff had surgery on both her right and left thumbs to alleviate pain. (386, 391, 401, 506, 531, 619, 635, 639).

vacuuming, as it increases her hand and knee pain, and that she has difficulty cooking because she cannot remember what ingredients need to go in and in what quantities. (AR 79-80).

The ALJ found that Plaintiff had severe impairments due to, *inter alia*, chronic knee pain problems, bilateral thumb tendinitis/trigger thumbs, ovarian cysts, and a history of anxiety/panic disorder and depression. (AR 17-18). However, while the ALJ acknowledged Plaintiff's allegations and medical records regarding ovarian cysts, the ALJ ultimately concluded that Plaintiff "has not required ongoing treatment for abdominal pain due to ovarian cysts" and made no mention of Plaintiff's testimony that she is relegated to the couch in the fetal position once every two weeks due to such pain. (AR 18, 23, 26, 83). This is especially problematic in light of the Vocational Expert's (VE) testimony that an individual who misses two or more days of work per month cannot maintain competitive employment. (AR 105-06). Yet, despite these findings, Plaintiff's mental and physical difficulties noted in the underlying record, and Plaintiff's testimony, the ALJ ultimately concluded that Plaintiff's ability to engage in the relevant daily activities indicated that she was capable of performing full time work.

In reaching the RFC determination, the ALJ improperly relied upon Plaintiff's daily activities in the face of records and testimony documenting her physical and mental impairments. This was error. *Beardsley*, 758 F.3d at 838. The ALJ impermissibly used Plaintiff's daily activities to justify the parameters of the RFC and equated Plaintiff's ability to engage in daily activities with a lack of disability related to her claimed impairments. Accordingly, the Court recommends remand for proper consideration of Plaintiff's alleged mental and physical impairments and any potential limitations therein.

It would be prudent to note another issue. In finding that Plaintiff has no limitation in adapting or managing herself, the ALJ commented that, while Plaintiff "reported difficulty

handling stress and changes in routine," she nonetheless "seems to be actively caring for her young daughter" and "has not been hospitalized for psychiatric reasons." (AR 21). The Seventh Circuit Court of Appeals has criticized similar reasoning.[6] *See Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("The administrative law judge's casual equating of household work to work in the labor market cannot stand. Gentle *must* take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts."). While it could be that Plaintiff indeed has no limitation in adapting or managing herself, the ALJ failed to construct a logical bridge between the evidence and this conclusion. *See Beardsley*, 758 F.3d at 837. The Court thus also recommends remand for a proper determination of whether Plaintiff has a limitation in adapting or managing herself.

### B. Step Five Determination

Plaintiff argues that the ALJ's step five determination is not supported by substantial evidence. Specifically, Plaintiff asserts that the VE provided unreliable testimony at the hearing regarding the jobs Plaintiff could potentially perform. (Pl.'s Br. 23-27, ECF No. 18). Plaintiff states that the VE did not make available information regarding the skill and exertion requirements of jobs despite being asked to do so at the hearing. *Id.* at 25. According to Plaintiff, this gives rise to the inference that the VE failed to consider all the factors that may influence the allocation of a Standard Occupational Classification (SOC) code population to a particular Dictionary of Occupational Titles (DOT) job title. *Id.*

Plaintiff's main contention seems to be that, for certain positions, the SOC code will contain multiple DOT titles, some of which require different exertional or skill levels. For example,

---

[6] The Court notes that the ALJ's references to Plaintiff's ability to care for her child, in reciting Plaintiff's daily activities and finding that they indicated that Plaintiff is capable of performing full time work, were inappropriate for this same reason.

13

the VE testified that the SOC code for photocopy machine operator contains six DOT titles, of which four are light or sedentary. (AR 108-09). The VE testified that there were 54,900 photocopy machine operator jobs in the national economy, noting that this number came from the United States Department of Labor. (AR 104, 108). When asked, the VE explained that, without additional research, he was unable to opine on the differing exertional and skill levels required of the DOT titles contained within the relevant SOC codes for the positions he offered in response to the ALJ's hypotheticals. (108-11). Crucially, however, this is far from a simple instance of the VE failing to provide supporting data. As discussed in more detail below, the VE acknowledged that Plaintiff was unable to perform some subset of the jobs the VE identified, given the limitations noted in the ALJ's hypotheticals. (AR 103-04, 108-11). The VE was just unable to determine the number of positions within that subset without further research. (AR 108-11). Plaintiff thus argues that the VE failed to provide information necessary to determine the number of jobs that Plaintiff could actually—ostensibly, per the ALJ's hypotheticals and the RFC—perform. (Pl.'s Br. 25, ECF No. 18).

The Commissioner argues that the VE was sufficiently qualified and appropriately considered information in both the DOT and SOC. (Def.'s Mem. 16, ECF No. 21). The Commissioner further notes the Supreme Court of the United States' recent holding that "[a] vocational expert's testimony may count as substantial evidence even when unaccompanied by supporting data."[7] *Id.* at 17 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1155 (2019)). The

---

[7] The Commissioner leaves out the first clause of this quotation. What the Supreme Court stated was, "*[a]ssuming no demand*, a vocational expert's testimony may count as substantial evidence even when unaccompanied by supporting data." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1155 (2019) (emphasis added). Nonetheless, this omission has little bearing on the outcome—the Supreme Court went on to explain that, while "[i]n some cases, the refusal to disclose data, considered along with other shortcomings, will prevent a court from finding that 'a reasonable mind' could accept the expert's testimony . . . [,] in other cases, that refusal will have no such consequence." *Id.* at 1156 (citation omitted). Indeed, "[e]ven taking it into account, the expert's opinion will qualify as 'more than a mere scintilla' of evidence supporting the ALJ's conclusion. Which is to say it will count . . . as substantial." *Id.*

Commissioner thus asserts that the VE's testimony was supported by his professional experience and training, and the ALJ was therefore entitled to rely on it. *Id.* As such, the Commissioner concludes that the ALJ's step five determination is supported by substantial evidence. *Id.* The Court agrees with the Commissioner that any attempt by Plaintiff to suggest that the VE's failure to provide supporting data was fatal to the VE's opinion, or the ALJ's ability to rely on the VE's opinion for that reason alone, would be futile in light of *Biestek*.

A bit of background regarding the DOT and SOC is needed to elucidate the parties' arguments. As explained by one court, "[t]he [DOT] is a catalog of jobs that contains no statistics regarding the number of jobs in a given category that exist in the national economy." *Chavez v. Saul*, No. 1:19-CV-301 DRL, 2020 WL 5494744, at *3 n. 1 (N.D. Ind. Sept. 11, 2020) (citing *Herrmann v. Colvin*, 772 F.3d 1110, 1114 (7th Cir. 2014)). The SOC, in turn, "was developed by the Bureau of Labor Statistics to replace the DOT system. The SOC codes are much broader than the DOT titles, meaning many DOT titles might fall within a single SOC code." *Id.* at 3* n. 2 (citing *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1283 (11th Cir. 2020); *Brault v. SSA*, 683 F.3d 443, 447 (2d Cir. 2012)). The Seventh Circuit Court of Appeals has explained that the DOT is significantly limited in that "it describes only job duties and requirements, without also reporting an estimate of how many of those positions exist in the national economy." *Chavez v. Berryhill*, 895 F.3d 962, 965 (7th Cir. 2018). Therefore,

> [t]o determine the number of jobs, a VE must consult another resource. One commonly used is the Department of Labor's compilation of Occupational Employment Statistics. That publication does not use the DOT job grouping system, but instead relies upon another classification system, the Standard Occupational Classification (SOC).
>
> The use of one system to supply the job titles and another to provide the number of jobs creates a matching problem: a one-to-one correlation does not exist. When a VE identifies an SOC code and the number of jobs in that code, that number

15

>approximates (at best) the number of positions within a DOT job group—not the specific DOT job title that the VE identified as suitable for a particular claimant.

*Id.* at 956-66. The law does not require that VEs provide an exact number of jobs available for any given position and, indeed, the Court of Appeals has acknowledged that "[a] VE's estimate will be just that—an estimate." *Id.* at 968 ("The VE necessarily must approximate, and there is no way to avoid uncertainty in doing so."). Nonetheless, "any method that the agency uses to estimate job numbers must be supported with evidence sufficient to provide some modicum of confidence in its reliability." *Id.* at 969. To put it simply, "a VE must use some method for associating SOC-based employment numbers to DOT-based job types." *Chavez v. Saul*, 2020 WL 5494744, at *3 n. 2 (quoting *Brault*, 683 F.3d at 446).

The Court rejects any broad attempt to suggest that VEs must follow a particular method of analysis. As the Supreme Court recently made clear, VE testimony is ordinarily not subject to categorical rules and "[t]he inquiry, as is usually true in determining the substantiality of evidence, is case-by-case." *Biestek*, 139 S. Ct. at 1157. The relatively narrow question here is whether, when a VE acknowledges that a claimant is unable to perform some subset of the jobs the VE identifies due to the claimant's limitations, as those limitations are set forth in the ALJ's hypothetical and eventual RFC determination, the VE must make some effort to weed out the subset of jobs that the claimant is unable to perform so that these positions are not included in the VE's statement regarding the number of jobs existing in the national economy that can be performed by the claimant. And, of course, if a VE opines that there are one hundred jobs in the national economy for a certain position, then later acknowledges that a claimant is unable to perform some subset of these jobs due to the exertional or skill levels required, it begs the question of whether there will be ninety-nine positions left that the claimant can perform or, perhaps, only one.

16

Here, it does not appear to the Court that the VE employed any methodology to associate the SOC-based employment numbers to the DOT-based job types for the cited positions. The VE opined that, under the ALJ's first hypothetical (which matched the RFC) Plaintiff could perform the requirements of a photocopy machine operator, for which there are 54,900 jobs in the national economy, mailroom clerk, for which there are 85,800 jobs in the national economy, and package sorter, for which there are 671,000 jobs in the national economy. (AR 104). On examination by Plaintiff's attorney, the VE stated that four of the six DOT titles in the relevant SOC code for photocopy machine operator required light or sedentary exertional levels, which presumably meant that the remaining two DOT titles required medium or heavy exertional levels. (AR 108-09). The VE further stated that eleven of fourteen DOT titles in the relevant SOC code for mailroom clerk required light or sedentary exertional levels, while eighteen of twenty DOT titles in the relevant SOC code for package sorter required light or sedentary exertional levels. (AR 109-10).

Per the ALJ's first hypothetical, which elicited these positions from the VE, and the ALJ's eventual RFC determination, Plaintiff was restricted to light work. (AR 21, 103). But how was the ALJ to know how many of the 54,900 photocopy machine operator jobs existing in the national economy remained for a claimant with such a restriction? The only information provided was that Plaintiff could perform four out of the six job titles comprising those 54,900 positions. No further clarification was provided to elucidate how many of those 54,900 jobs fell under the four job titles requiring only light work. The Seventh Circuit Court of Appeals has rejected the notion that "all

job titles within a particular DOT job group exist in equal numbers in the national economy."[8] *Chavez v. Berryhill*, 895 F.3d at 966. Yet, here, the VE did not provide any analysis regarding the number of jobs that remained when those that Plaintiff could not perform—the two out of six job titles requiring more than light work—were excluded. And, the same problem persists for the other positions identified by the VE. (*See* AR 104, 108-10).

It would be impossible for the VE to have provided the precise number of jobs in the national economy for each position cited at the hearing. Nonetheless, the VE's own testimony acknowledged that the numbers offered encompassed jobs that Plaintiff could not perform under the relevant hypothetical and, when confronted with this issue, the VE made no effort to exclude such positions. The VE's failure to utilize any type of methodology to winnow down the job numbers offered to those that might actually encompass work Plaintiff could perform under the hypothetical—i.e., the VE's failure to even attempt to omit the jobs that required medium or heavy exertional levels—rendered the VE's job estimates unreliable. The ALJ's reliance on those job numbers was thus in error, rendering the decision unsupported by substantial evidence. *Chavez v. Berryhill*, 895 F.3d at 963 ("The decision was not supported by substantial evidence because the ALJ failed to ensure that the vocational expert's job estimates were reliable."). Accordingly, the

---

[8] The Seventh Circuit Court of Appeals, in discussing the unreliability of the so-called equal distribution method, illustrated this issue as follows:

> Consider a VE who determines that a particular claimant is able to perform one of the 24 jobs listed within the DOT under group 313, entitled "Chefs and Cooks, Hotels and Restaurants." U.S. DEPARTMENT OF LABOR, I DICTIONARY OF OCCUPATIONAL TITLES 313 (4th ed. 1991). Under the equal distribution method, the VE would assume that each DOT job title encompassed by the corresponding SOC code exists in equal numbers. But it does not take much knowledge of job markets to know that, while certain jobs may exist in large numbers (for example, a "pizza baker," DOT 313.381-014, who "prepares and bakes pizza pies"), others clearly do not (such as a "chef de froid," DOT 313.281-010, who designs "artistic food arrangements for buffets in formal restaurants" including "mold[ing] butter into artistic forms").

*Chavez v. Berryhill*, 895 F.3d 962, 966 (7th Cir. 2018).

Court recommends remand for proper consideration of what jobs, if any, exist in the national economy that can be performed by Plaintiff.

## CONCLUSION

Based on the foregoing, the Court **RECOMMENDS** that the District Court reverse the decision of the Commissioner of the Social Security Administration and remand for further proceedings.

This Report and Recommendation is submitted pursuant to 28 U.S.C. § 636(b)(1)(C). Pursuant to 28 U.S.C. § 636(b)(1), the parties shall have fourteen (14) days after being served with a copy of this Recommendation to file written objections thereto with the Clerk of Court. The failure to file a timely objection will result in waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. *Willis v. Caterpillar, Inc.*, 199 F.3d 902, 904 (7th Cir. 1999); *Hunger v. Leininger*, 15 F.3d 664, 668 (7th Cir. 1994); *The Provident Bank v. Manor Steel Corp.*, 882 F.2d 258, 260-261 (7th Cir. 1989); *Lebovitz v. Miller*, 856 F.2d 902, 905 n.2 (7th Cir. 1988).

So ORDERED this 20th day of January, 2021.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT